UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
LEROY ANTHONY HENRY,

          Plaintiff,                      <u>MEMORANDUM AND ORDER</u>

   - against -                            Civil Action No.
                                          08-CV-1718 (DGT)
ANDREA QUARANTILLO, District Director,
New York District of the U.S.
Citizenship and Immigration Services;
ROBERT T WEIMANN, Chief,
Administrative Appeals Office,
United States Citizenship and
Immigration Services; AND
U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

          Defendants.
----------------------------------X

Trager, J.:

        Plaintiff seeks a declaratory judgment under

8 U.S.C. § 1503(a) that he has acquired derivative citizenship

through his father's naturalization, pursuant to Immigration and

Nationality Act ("INA") § 321(a)(3), as previously codified at 8

U.S.C. § 1432(a)(3).[1] Defendants move to dismiss the complaint

and, alternatively, for summary judgment, arguing (1) the action

is untimely; (2) plaintiff has failed to exhaust administrative

remedies; (3) the action is barred by res judicata; and

---

[1] Section 321 of the INA was repealed by the Child Citizenship
Act ("CCA") of 2000, Pub. L. No. 106-395, § 103(a), 114 Stat.
1632 (2000), codified at 8 U.S.C. § 1431. Nevertheless, because
plaintiff claims to have acquired derivative citizenship prior
to 2000, section 321 still governs the merits of plaintiff's
citizenship claim. <u>See</u> <u>Ashton v. Gonzales</u>, 431 F.3d 95, 97
(2d Cir. 2005) (holding that CCA is not retroactive).

(4) plaintiff fails on the merits of his citizenship claim.
Plaintiff cross-moves for summary judgment. For the reasons
stated below, plaintiff is likely time-barred from bringing this
action. However, even if plaintiff's claim were timely, his
evidence does not establish a claim to derivative citizenship
and, therefore, summary judgment is granted in favor of the
defendants.

**Background**

**a. Henry's History in the United States**

Plaintiff Leroy Henry was born in Jamaica on October 29,
1959. Pl. Ex. A. His parents, also natives of Jamaica,
cohabitated in Jamaica from 1953 to 1966, but were never
formally married. Pl. Ex. B at ¶ 4; Compl. ¶ 16. In 1967, both
of plaintiff's parents immigrated to the United States, leaving
Henry with his grandmother in Jamaica. Pl. Ex. B at ¶ 5; Compl.
¶ 17-18. In 1970, at the age of 11, Henry entered the United
States as a lawful resident alien and began residing with his
mother. Def. Ex. D; Pl. Ex. B at ¶ 6. However, the parties
dispute whether plaintiff thereafter lived with his mother or
father from 1971 to 1977, at the time of his eighteenth
birthday. Each of Henry's parents has submitted an affidavit
stating that Henry was in the sole custody of his father during
this period. Pl. Ex. B at ¶ 6-7; Pl. Ex. C at ¶ 3. But as the

defendants point out, Henry's father's application for citizenship in 1972 did not list Henry as his child. Def. Ex. E. In contrast, Henry's mother's application for citizenship in 1978 listed Henry as her child and stated that he was living with her. Def. Ex. G. On November 21, 1972, when Henry was thirteen, his father was naturalized as a United States citizen. Def. Ex. F; Pl. Ex. J. His mother was naturalized on October 3, 1978, when Henry was nineteen. Def. Ex. H.

Beginning at age nineteen, Henry accumulated a series of criminal convictions. In February of 1979, plaintiff was convicted of robbery, abduction and use of a firearm in Virginia. Def. Ex. I at 1. In June of 1980, Henry was convicted of attempted criminal possession of a weapon in the third degree and was sentenced in New York to two to four years imprisonment as a second felony offender. Id. at 2. In 1996, plaintiff was found guilty of violating a number of federal criminal statutes, including conspiracy to commit mail fraud and interstate transportation of stolen vehicles, for which he was sentenced to forty-one months in prison. Def. Ex. J.


**b. Previous Attempts to Obtain Derivative Citizenship**

On April 23, 1999, while incarcerated, plaintiff filed an N-600 application for citizenship ("N-600") with the Immigration and Naturalization Service ("INS"), claiming to have derived

citizenship from his father's 1972 naturalization.[2]  Ex. K;

Compl. ¶ 22.  On August 17, 1999, the INS denied the N-600 on

the grounds that plaintiff's parents had not been "legally

separated," and that Henry had not been in his father's legal

custody, as required by section 321(a)(3) of the INA.  Def. Ex.

L; Compl. ¶ 22.

Two days later, on August 19, 1999 — one day before his

anticipated release from prison — the INS initiated removal

proceedings against plaintiff on account of his conviction as an

aggravated felon, in accordance with 8 U.S.C.

§ 1227(a)(2)(A)(iii).  Def. Ex. M; Compl. ¶ 23.  In his

proceedings, plaintiff argued that removal was improper because

he had acquired derivative citizenship from his father's

naturalization.  Def. Ex. O.  However, the Immigration Judge

("IJ") determined that plaintiff had not acquired citizenship

because his parents had not been "legally separated," and that

plaintiff was a removable alien due to his felony conviction.

Id.  On May 25, 2000, the Board of Immigration Appeals ("BIA")

affirmed the IJ's decision.  Id.; Compl. ¶ 23.

While removal proceedings were ongoing, and after an

unsuccessful appeal of plaintiff's N-600 denial to the

---

[2] An N-600 is an Application for Certificate of Citizenship that
can be filed on behalf of any person claiming United States
citizen status based on United States parentage.  8 C.F.R.
§ 322.3.

Administrative Appeals Office ("AAO"), plaintiff and his father filed an amended complaint in this Court against the Attorney General on January 4, 2000.[3] See Am. Compl. for a Declaratory J., Henry v. Reno, No. 99-cv-7914 (Trager, J.), attached as Def. Ex. N. This complaint sought a declaration, under § 1503(a), that plaintiff's N-600 had been incorrectly decided, that plaintiff was a citizen and that plaintiff's deportation should be enjoined. Id.; Compl. ¶ 24. Plaintiff later abandoned the citizenship claim, and instead argued that section 321 of the INA, requiring a legal separation and legal custody by the naturalized parent as prerequisites to derivative citizenship acquisition, violated the Equal Protection Clause of the Constitution. Henry v. Reno, No. 99-CV-7914, at 1 (E.D.N.Y. Aug. 6, 2002) ("Henry I"), attached as Def. Ex. P; Compl. ¶ 24. The complaint was dismissed on August 6, 2002, upon a determination that INA section 321 did not discriminate on the basis of sex in Henry's case, where his mother and father were unwed but he was legitimate under Jamaican law. In that event, our law requires each parent to obtain citizenship before the child's eighteenth birthday in order for derivative citizenship to attach. Id. at 3-4. Somewhat ironically, if Henry had not

---

[3] The original complaint was filed on December 2, 1999 by plaintiff's father, but sought the same relief on the same grounds as the amended complaint, which simply added plaintiff as a party.

been legitimate under Jamaican law, our laws would have allowed Henry's mother to automatically transfer citizenship to Henry if she had obtained citizenship before his eighteenth birthday, but would not have allowed such a transfer to occur through his father. Id.

On August 22, 2002, a few weeks after Henry I was dismissed, the INS removed plaintiff to Jamaica. Compl. ¶ 25. On February 6, 2006, plaintiff was arrested for illegally reentering the United States, leading the INS, on February 22, 2006, to reinstate plaintiff's prior removal order of August 22, 2002. Def. Ex. R; Compl. ¶ 26. While in detention pending his second removal, plaintiff filed another action on March 8, 2007, again seeking a declaration of citizenship under 8 U.S.C. § 1503(a). See Henry v. Mukasey, No. 07-cv-01005, 2007 WL 4555894, at *1 (E.D.N.Y. Dec. 19, 2007) ("Henry II"), attached as Def. Ex. Z at 1.; see also Compl. for Declaratory J. in Henry II, attached as Def. Ex. T.

While Henry II was pending before this Court, plaintiff filed a second N-600 (the "second N-600") with United States Citizenship and Immigration Services ("USCIS") on October 17, 2007.[4] Def. Ex. X; Compl. ¶ 28. This second N-600 was

---

[4] Formerly, these forms were processed and decided by the INS under the Department of Justice ("DOJ"). However, in 2002, the Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135, abolished the INS and reassigned its functions to subdivisions

accompanied by an order from the Resident Magistrate's Court in Jamaica declaring that, according to Jamaican law, Henry's parents had a common law marriage and were legally separated in 1966, pursuant to the Maintenance Act of 2005. Def. Ex. V ("the Magistrate's Order"); Compl. ¶ 28. At this point, the plaintiff asked this Court to dismiss <u>Henry II</u> while the USCIS processed the second N-600. <u>See</u> <u>Henry II</u>, at *1. In a memorandum and order dated December 19, 2007, <u>Henry II</u> was dismissed with prejudice because 8 U.S.C. § 1503(a)'s five-year statute of limitations barred the claim, but the question of whether a new § 1503(a) action would be possible based on the outcome of the second N-600 was not reached. <u>Id.</u> at *2-3.

USCIS denied the second N-600 on December 19, 2007 on the ground that plaintiff's parents had not obtained a legal separation. Def. Ex. Y at 2-3; Compl. ¶ 29. Plaintiff appealed this decision to the AAO, which upheld USCIS's determination on March 14, 2008, finding that the Magistrate's Order did not establish that plaintiff's parents had obtained a legal separation before his eighteenth birthday. Def. Ex. aa at 2-4; Compl. ¶ 30. On April 25, 2008, plaintiff filed the instant action based on the denial of his second N-600.

---

of the Department of Homeland Security. <u>Brito v. Mukasey</u>, 521 F.3d 160, 162 n.2 (2d Cir. 2008). For this reason, USCIS now handles N-600 applications.

On May 6, 2008, plaintiff pled guilty to one count of
passport application fraud, per 18 U.S.C. § 1542, in connection
with actions he took to try to secure his illegal reentry into
the United States in 2006.  United States v. Henry, No. 06-cr-
185 (S.D.N.Y. May 6, 2008), attached as Def. Ex. dd.  Plaintiff
was sentenced to a period of time already served, id., and was
removed to Jamaica on June 14, 2008.  Def. Ex. ee.


**c. The Current Action**

Plaintiff's current declaratory action, filed under
8 U.S.C. § 1503(a), seeks (1) a declaration of United States
citizenship; (2) a declaration that plaintiff's second N-600
denial is invalid as a matter of law; (3) an order compelling
USCIS to approve plaintiff's second N-600 application; and
(4) any other relief deemed "just and proper."  Compl. ¶ 32—49.
Defendants have moved to dismiss the complaint or, in the
alternative, for summary judgment.  Plaintiff has cross-moved
for summary judgment.

Since the commencement of this action, the government has
established that the Magistrate's Order was at least improperly
executed, if not fraudulent.  Def. Ex. bb.  For obvious reasons,
plaintiff no longer relies on this document.  However, plaintiff
has submitted a new Consent Order from a Jamaican court
containing substantially the same facts.  Pl. Ex. K ("the

Consent Order") (dated July 29, 2008). Specifically, the
Consent Order states that plaintiff's parents had a common law
marriage between 1953 and 1966 and have been separated since
1966. Id. Plaintiff has also submitted a legal opinion letter
from his counsel in Jamaica regarding common law marriage and
separation. Pl. Ex. L ("the Legal Opinion Letter").

## Discussion

### (1)

### Subject Matter Jurisdiction

Although neither party raises the issue, plaintiff's
complaint presents serious questions about the subject matter
jurisdiction of this Court.[5] Because federal courts have an
independent obligation to ascertain subject matter jurisdiction,
the issue must be considered sua sponte. Fed. R. Civ. Pro.
12(h)(3); see, e.g., United Republic Ins. Co. v. Chase Manhattan
Bank, 315 F.3d 168, 170-71 (2d Cir. 2003) (subject matter
jurisdiction should be treated as a threshold issue, not simply
addressed when raised by one of the parties).

---

[5] The government does, however, raise the contention that this
action falls outside the five-year period for bringing § 1503(a)
challenges. This contention is addressed infra, part (2) of the
discussion.

**a. Pathways to Claim Derivative Citizenship**

An alien may make a derivative citizenship claim to the courts in two ways. First, he may raise the claim as a defense to removal proceedings before an IJ, and appeal any negative decision to the BIA. After exhausting this claim administratively, he may sue only in the circuit courts under 8 U.S.C. § 1252(b) for review of the citizenship claim. See 8 U.S.C. § 1252(b)(5) (nationality claims made in an appeal from removal proceedings may be decided only by circuit courts).

Second, he may proceed administratively by filing an N-600 application with USCIS, and then may appeal any negative decision to the AAO. Upon exhaustion, the alien may sue in the district court under § 1503(a) for a declaration of citizenship. Boyd v. Immigration & Customs Enforcement, 344 F. Supp. 2d 869, 872 (E.D.N.Y. 2004).

In the instant case, plaintiff is proceeding through this second method and pleads jurisdiction under 8 U.S.C. § 1503(a), arguing that USCIS denied him his rights as a United States citizen by denying his most recent N-600 application for citizenship.[6] Section 1503(a) grants district courts subject

---

[6] Under 8 U.S.C. § 1503:

> If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the

matter jurisdiction to declare, after an administrative denial

to the contrary, that an individual is a national[7] of the United

States, subject to two exceptions:

> [N]o such action may be instituted in any case if the issue
> of such person's status as a national of the United States
> (1) arose by reason of, or in connection with any
> removal proceeding under the provisions of this
> chapter or any other act, or
> (2) is in issue in any such removal proceeding.

8 U.S.C. § 1503(a) (hereinafter "exception (1)" and "exception

(2)").  Exception (2) is not implicated here, as Henry's status

is not currently in issue in a removal proceeding.  <u>See</u> <u>Rios-</u>

<u>Valenzuela v. Dep't of Homeland Sec.</u>, 506 F.3d 393, 397-98 (5th

Cir. 2007) (finding a § 1503(a) claim not to be barred under

exception (2) when there was no pending removal proceeding).

However, exception (1) could be read to bar Henry's claim, given

that he put his nationality at issue in his removal proceedings

prior to filing his second N-600, which forms the basis of his

action here.  Upon close examination, it is determined that

exception (1) also should not bar Henry's claim.  But because

---

> United States, such person may institute an action
> under the provisions of section 2201 of title 28
> against the head of such department or independent
> agency for a judgment declaring him to be a national
> of the United States . . . .

[7] A claim to be a "national," as used in the INA, includes a
claim to citizenship.  8 U.S.C. § 1101(a)(22) ("The term
'national of the United States' means (A) a citizen of the
United States or (B) a person who, though not a citizen of the
United States, owes permanent allegiance to the United
States.").

this determination is a difficult one, it bears some
elaboration.

## b. Whether Henry's current 1503(a) claim arose "in connection with" removal proceedings

The Second Circuit has not addressed the question of
whether exception (1), prohibiting a § 1503(a) action that arose
"by reason of, or in connection with any removal proceeding,"
serves to bar an action like Henry's.  However, the reasoning of
a few courts that have considered the meaning of exception (1)
in similar contexts at least suggests that subject matter
jurisdiction should exist here.

At first blush, based on the literal wording of the
statute, it might appear that because Henry filed his second N-
600 after his removal order was reinstated and because he raised
a citizenship claim in his removal proceedings, the issue of his
status as a national arose "in connection with" his removal
proceedings.[8] However, this interpretation of "in connection

---

[8] It is worth noting that Henry might also make a claim to
jurisdiction based on an argument that his citizenship claim did
not "arise," i.e. "originate," in connection with his removal
proceedings because he filed his first N-600 before his removal
proceedings began.  See North v. Rooney, No. 03-1811, 2003 WL
21432590, at *4 (D.N.J. June 18, 2003) (finding subject matter
jurisdiction to consider plaintiff's claim for citizenship under
§ 1503(a) arising from his denied N-600, which was filed after
removal proceedings commenced, in part because "the issue of
plaintiff's citizenship actually arose well before the
commencement of the 1999 removal proceedings."); cf. Rios-

with" would mean that a plaintiff would be forever foreclosed

from bringing a § 1503(a) action, even after his removal

proceedings had terminated, if his citizenship was put in issue

in those removal proceedings.  This reading of "in connection

with" goes too far in restricting removed persons from ever

having a further opportunity to present their claims to

eligibility for the "most precious right" of United States

citizenship.  Kennedy v. Mendoza-Martinez, 372 U.S. 144, 159

(1963).

On the one hand, it is clear that exception (1)'s "in

connection with" language erects a broad bar to § 1503(a)

actions.  On the basis of this language, courts have interpreted

exception (1) to bar § 1503(a) actions even after removal

---

Valenzuela, 506 F.3d at 399 (holding that jurisdiction was
barred because Rios-Valenzuela's citizenship claim "originate[d]
. . . in connection with the removal proceedings").

However, whether or not Henry's first N-600 was filed "in
connection with" removal proceedings is debatable.  The Southern
District of New York has declined to exercise § 1503
jurisdiction where an alien filed an N-600 prior to, but in
anticipation of, removal proceedings.  Patino v. Chertoff, 595
F. Supp. 2d 310, 313-14 (S.D.N.Y. 2009) (finding that because
the complaint alleged that it was commenced in anticipation of
removal proceedings, this was sufficient to establish that the
claim arose "in connection with" removal proceedings and barred
jurisdiction).  The timing of Henry's first N-600 application,
which was filed only four months before INS began deportation
proceedings, suggests (though with less clarity than in Patino)
that it too was filed "in anticipation of" removal proceedings
and thus cannot form the basis of jurisdiction under § 1503(a).
However, this determination need not be made here, because
regardless, § 1503(a) jurisdiction exists on the basis of
Henry's second N-600 denial.

proceedings have terminated in situations where the claim to
citizenship was closely connected with the removal proceedings.
See Rios-Valenzuela, 506 F.3d at 398-99 (finding that the fact
that removal proceedings had terminated did not mean that the
§ 1503(a) action could proceed, because N-600 had been filed
during and therefore "in connection with" removal proceeding);
Said v. Eddy, 87 F. Supp. 2d 937, 941 (D. Alaska 2000) ("The
past tense 'arose' used in the first exception also indicates
that this provision applies to concluded removal proceedings.");
Duran v. Reno, No. 97-cv-3156, 1998 WL 54611, at *3 (S.D.N.Y.
Feb. 10, 1998) (finding no subject matter jurisdiction to review
N-600 filed during deportation proceedings because plaintiff was
seeking to "circumvent" the regulations requiring him to pursue
claims of citizenship raised during his deportation proceedings
in the circuit court); Patino, 595 F. Supp. 2d at 313
(determining that § 1503(a) action commenced in anticipation of
removal proceedings was barred because it was connected with
removal proceedings).

On the other hand, many courts agree that jurisdiction
under § 1503(a) is not forever precluded once the issue of
citizenship has arisen in removal proceedings.[9] See Rios-

---

[9] In contrast, if an alien did not raise the issue of citizenship
in removal proceedings, a later § 1503(a) claim based upon a
denied N-600 would be less likely to be barred, as the issue of

Valenzuela, 506 F.3d at 399 ("[W]e do not read the exception as forever hanging an albatross around the neck of those who first raise citizenship as a defense in a removal proceeding."); Benjamin v. Bureau of Customs, 401 F. Supp. 2d 184, 185-86 (D. Conn. 2005) (finding that even though alien raised his citizenship claim in removal proceedings, he still could file an N-600 and use that as the basis of a later § 1503(a) action, because "[a]n alien is entitled to apply for a certificate of citizenship regardless of a final order of removal"); Garcia-Izquierdo v. Gartner, No. 04-Civ-7377, 2004 U.S. Dist. LEXIS 18761, at *6 n.1 (S.D.N.Y. Sept. 16, 2004) ("Deportation will not preclude Petitioner's ability to proceed with his N-600 application. . . . [A]nd a final order of removal has no bearing on an alien's ability to apply for a certificate of citizenship.") (internal citations omitted); Ewers v. INS, No. 03-cv-104, 2003 U.S. Dist. LEXIS 6041, at *5-6 (D. Conn. Feb. 28, 2003) (same).

Thus, there is a delicate balance to determining when a § 1503(a) claim to citizenship, made after citizenship was placed in issue in removal proceedings, is far enough removed from those proceedings so as not to have arisen "in connection with" them.  As the Fifth Circuit indicated, "[s]o long as a

citizenship probably would not be found, in that situation, to have arisen "in connection with" removal proceedings.

citizenship claim finds its genesis outside of the context of removal proceedings, the exception is no bar to jurisdiction; thus, for example, once removal proceedings have run their full course and terminated, any future citizenship claim would not arise in those removal proceedings." <u>Rios-Valenzuela</u>, 506 F.3d at 399.  Similarly, after rejecting a plaintiff's § 1503(a) action because it was based directly on her terminated removal proceedings, the District of Alaska noted that a future action remained possible, stating:

> When and if plaintiff is at some future time denied a right or privilege of a United States national by a department, agency, or official of the United States, she will be entitled to bring an action as authorized by Section 1503; and the interposition of such other federal action will take plaintiff's case out of exception (1) to subsection 1503(a).

<u>Said</u>, 87 F. Supp. 2d at 943.[10]

---

[10] However, not all courts have fallen in line with <u>Rios-Valenzuela</u> and <u>Said</u>.  Some courts have held that even when N-600s were filed after the termination of removal proceedings, § 1503(a) claims based on their denials were still connected with the earlier removal proceedings.  <u>See Duarte-Ceri v. Napolitano</u>, No. 07-cv-500A, 2009 WL 1806694, at *4 (W.D.N.Y. June 23, 2009)(finding no jurisdiction when plaintiff filed his N-600 three years after he was ordered removed); <u>Madar v. USCIS</u>, No. 07-cv-1254, 2008 WL 5111920, at *2 (W.D. Pa. Dec. 2, 2008) (finding no jurisdiction when plaintiff filed N-600 two years after removal order affirmed); <u>Allen v. Adams</u>, No. EP-03-CA-0383, 2004 WL 838011, at *3 & n.7 (W.D. Tex. 2004) (finding that even though petitioner's N-600 was submitted in 2000, two years after BIA affirmed plaintiff's order of removal, it still was "in connection with" the removal order because, as of the year 2000, "petitioner was in fact subject to an order of removal and

The hypothetical situation contemplated in both <u>Rios-Valenzuela</u> and <u>Said</u> has come to pass in Henry's case: after his removal, he alleged a new, independent denial of a right or privilege of nationality that forms the basis of his current § 1503(a) action. Henry's order of removal was reinstated on February 22, 2006, at which point "removal proceedings ha[d] run their full course and terminated." <u>Rios-Valenzuela</u>, 506 F.3d at 399. Approximately twenty months later, on October 17, 2007, Henry filed a second N-600 and offered new evidence of citizenship eligibility. Because this second N-600 was filed well after removal proceedings had terminated, and because its denial constitutes the type of federal action that may form the basis of a § 1503(a) claim, denial of this N-600 serves as "the interposition of such other federal action" that "take[s] plaintiff's case out of exception (1) to subsection 1503(a)." <u>Said</u>, 87 F. Supp. 2d at 943; <u>see also</u> <u>Rios-Valenzuela</u>, 506 F.3d at 399 (noting that the Government conceded that "[i]f Rios-Valenzuela were to again apply for citizenship at some future

_____

it thus may not be said that a lapse of time would place her
outside the reach of § 1252(b)(5)").

    <u>Duarte-Ceri</u> can be read consistently with <u>Rios-Valenzuela</u>
and <u>Said</u> because although the plaintiff there filed his N-600
three years after being ordered removed, he also filed a motion
to reopen his removal proceedings a month later, and thus put
his citizenship "in issue" in removal proceedings again. <u>See</u>
<u>Duarte-Ceri</u>, 2009 WL 1806694, at *4. However, <u>Madar</u> and <u>Allen</u>
cannot be so easily reconciled.

time, when no removal proceedings have been initiated, and the claim is denied, then . . . he would have a right to seek declaratory judgment"). Thus, subject matter jurisdiction exists under § 1503(a) to consider Henry's derivative citizenship claim arising from the denial of his second N-600.

### (2)

### Statute of Limitations

Defendants move to dismiss Henry's complaint under Fed. Rule of Civ. Proc. 12(b)(1), arguing that the statute of limitations has expired. Subsection 1503(a) requires that "an action [for a declaration of citizenship]. . . be instituted only within five years after the final administrative denial of [a right or privilege claimed as a national of the United States] . . . ." In Henry II, this Court dismissed Henry's 2007 complaint as untimely because Henry waited more than five years to bring his § 1503(a) claim after "the final administrative denial" of his first N-600 in 1999. See Henry II, at *2-3. However, there was no need at that time to "parse the meaning of 'final administrative denial,'" because Henry's second N-600 was then pending before USCIS and had not been presented to the court. Id. at *2. Now, however, the question of whether Henry's first or second N-600 should count as "the final

administrative denial" for § 1503(a) purposes is squarely at
issue.

Defendants believe that "the final administrative denial"
triggering the limitations period continues to be the INS's 1999
decision to deny Henry's first N-600.  Henry argues that it is
the denial of the second N-600, in 2007, that began the
statutory filing period.  The significance of this dispute is
obvious: if the denial of Henry's 2007 N-600 is the relevant
"final administrative denial," this action is timely; if it does
not, the period began running in 1999 and this action is
therefore untimely.[11]

Section 1503(a)'s statute of limitations specifies simply
that the time to bring an action is measured from "the final
administrative denial."  Standing alone, this might appear to
indicate that any "final administrative denial," irrespective of
whether another denial has occurred before it, counts as "the

---

[11] The determination of which N-600's denial should trigger the
statute of limitations is confounded by the fact that USCIS
disregarded its own established regulations by considering
Henry's second N-600. In accordance with the Code of Federal
Regulations, the USCIS should not process two applications from
the same individual: "After an application for a Certificate of
Citizenship has been denied and the appeal time has run, a
second application submitted by the same individual shall be
rejected and the applicant instructed to submit a motion for
reopening or reconsideration in accordance with 8 CFR § 103.5."
8 CFR § 341.6 (emphasis added).  However, this general
prohibition on repeat N-600s does not change the fact that in
this case, USCIS decided to consider plaintiff's second N-600 on
its merits, and thus the AAO's denial is now a final
administrative denial.

final administrative denial of such right or privilege" that can

form the basis of a § 1503(a) action. § 1503(a) (emphasis

added). However, as explained below, courts have routinely

treated only the first final administrative denial as relevant

for statute of limitations purposes.

In one key dispute involving § 1503(a)'s statute of

limitations, several circuits considered whether a voluntary

relinquishment of United States citizenship, followed by the

issuance of a Certificate of Loss of Nationality ("CLN"), was a

"final administrative denial" for purposes of § 1503(a). One

circuit held that a CLN was a final administrative denial

beginning the running of § 1503(a)'s limitations period, but

others disagreed and found that only the denial of a later

passport application (often applied for decades after

citizenship was relinquished, due to a change of heart)

constituted the type of "final administrative denial" that would

begin the running of § 1503(a)'s statute of limitations.

Compare Heuer v. U.S. Sec. Of State, 20 F.3d 424, 426-27 (11th

Cir. 1994) (a CLN is a final administrative denial), with Bensky

v. Powell, 391 F.3d 894, 897-98 (7th Cir. 2004) (a CLN is a

grant, not a denial), and Whitehead v. Haig, 794 F.2d 115, 119-

20 (3d Cir. 1986) (same).

For present purposes, the answer to this question is

irrelevant. What is relevant, however, is that all of these

courts were in agreement that it was the <u>first</u> "final
administrative denial" that triggered the running of the statute
of limitations, <u>not</u> the latest in a series of final denials.
<u>See, e.g.</u>, <u>Bensky</u>, 391 F.3d at 898 (finding that though a CLN
was not a denial, a 1985 denial of appeal to Board of Appellate
Review commenced running of § 1503(a)'s limitations period, and
thus suit commenced within five years of 1998 passport
application was untimely).  That is, they all agreed that if the
CLN were deemed a "final administrative denial," then an action
could not be brought more than five years after its issuance,
even if there had occurred in the interim another "final
administrative denial" in the form of a denied passport
application.[12]  As the court in <u>Hueur</u> succinctly explained:
"[When] a statute of limitations is involved, the view must be

---

[12] Moreover, Congress seems to have agreed with this
interpretation: in 1994, following this dispute among circuits,
it amended the section of the INA governing CLN issuances to
make clear that approval of a CLN "shall constitute a denial of
a right or privilege of United States nationality for purposes
of section 1503 of this title."  Pub. L. 103-416, 108 Stat.
4305, 4309 (codified as amended at 8 U.S.C. § 1501 (2006)).
This amendment, coming in the wake of the debate in the courts,
suggests that Congress agreed that it was problematic to allow a
§ 1503(a) action to be brought on the basis of a denied passport
application years or decades after a CLN was issued, when
relevant persons and evidence were no longer available.  <u>See</u>
<u>Bensky</u>, 391 F.3d at 898 (expressing this concern when holding a
CLN not to be a final administrative denial, but finding that as
the statute previously read, a CLN was best construed not as a
"denial," but rather a grant).  This clarification in § 1501
that a CLN should count as a denial for § 1503(a) purposes
reinforces the interpretation that it is the <u>first</u> final
administrative denial that is relevant for § 1503(a).

to the _first_ possible trigger to begin the countdown."  20 F.3d
at 426.

    The District of Columbia also reached this conclusion when
confronted with a factual situation similar to Henry's.  There,
it considered the case of a plaintiff who twice applied for a
United States passport, first in 1979 and again in 1984, before
bringing a § 1503(a) action in 1987.  _Icaza v. Shultz_, 656 F.
Supp. 819, 821 (D.D.C. 1987).  The plaintiff argued that the
relevant "final administrative denial" for statute of
limitations purposes was the later 1984 denial, but the court
disagreed.  It found that the 1979 denial of plaintiff's
passport application constituted "the final administrative
denial" for purposes of § 1503(a).  _Id._ at 822-23.  Thus, the
plaintiff's suit was time-barred because it occurred more than
five years after the first passport denial.  _Id._

     The _Icaza_ court explained the importance of reading "the
final administrative denial" to mean "the first final
administrative denial": if § 1503(a) was read to allow a claim
based on _any_ final administrative denial, "an individual could
indefinitely prolong the period in which a declaratory judgment
action may be brought simply by continuing to file applications
. . . .  It is illogical to commence the running of the
limitations period from the time of the latest in a series
of . . . applications.  Were this done, the limitations period

-22-

established by Congress in section § 1503(a) would be empty of meaning."  Id.

Applying this rule and its logic to the facts of Henry's case, it is the denial of his first N-600 that is the "first possible trigger" to begin the statute of limitations running, and, therefore, his current action, although based on a second N-600, is nevertheless untimely.  Cf. Hueur, 20 F.3d at 426. Otherwise, Henry could manipulate the statute and extend his ability to sue under it indefinitely by routinely filing N-600s (or otherwise accruing additional "final administrative denials"), thereby eviscerating the five-year limitations period contained in § 1503(a).  Cf. Icaza, 656 F. Supp. at 822-23.

Henry tries to stave off this conclusion with the suggestion that because his 2007 N-600 was based on new evidence, a § 1503(a) claim stemming from its denial somehow deserves to be treated differently.  But there is no precedent to suggest that when a second "final administrative denial" is based on the presentation of new evidence, it is somehow qualitatively different than previous denials and thus begins anew the statute of limitations.  Moreover, a method already existed for Henry to properly present new, previously unavailable evidence of citizenship.  As the Code of Federal Regulations makes clear, Henry was free to file a motion to reopen his 1999 N-600 application, and the untimely filing of

such a motion to reopen "may be excused in the discretion of the
Service where it is demonstrated that the delay was reasonable
and was beyond the control of the applicant or petitioner."
8 C.F.R. § 103.5.

It might be perceived as somewhat inequitable to deny
Henry's claim because of his failure to follow this process, as
USCIS, by ruling on Henry's second N-600, also disregarded the
Code of Federal Regulations, which instructs USCIS to deny a
second N-600 automatically and to direct an applicant instead to
file a motion to reopen.  See 8 C.F.R. § 341.6.  Perhaps, on the
basis of this inequity and Henry's claimed inability to have
discovered critical evidence in a timely manner, he might have a
claim that § 1503(a)'s statute of limitations should be
equitably tolled in his situation.[13]  However, even if Henry
could somehow establish eligibility for equitable tolling, it

---

[13] It is not clear whether § 1503(a)'s statute of limitations is
subject to equitable tolling.  See Smith v. McGinnis, 208 F.3d
13, 17 (2d Cir. 2000) (noting that equitable tolling may be
justified in "rare and exceptional circumstance[s]," including
the inability to discover critical evidence in a timely manner);
Diaz v. Kelly, 515 F.3d 149, 153 (2d Cir. 2008) (finding that
even statutory time limitations are subject to equitable
tolling).  However, it will not be decided for the first time
here whether § 1503(a) is subject to equitable tolling or
whether Henry's claim might merit such tolling, given that
Henry's claim fails on its merits.

would do him little good, as his citizenship claim is

substantively without merit, for reasons explained below.[14]

---

[14] Defendants also contend that plaintiff's claim should be barred by res judicata.  As they point out, Henry initially raised a claim to derivative citizenship in Henry I, before abandoning it.  Ordinarily, this procedural stance would be sufficient to preclude re-litigation of the same claim.  See Channer v. Dep't of Homeland Sec., 527 F.3d 275, 280 (2d Cir. 2008) (whether res judicata applies depends on whether "the second suit involves the same claim or nucleus of operative fact as the first suit") (internal quotation marks omitted).  However, it is not clear that Henry in fact could have raised his derivative citizenship claim in Henry I, because that complaint was filed while his eligibility for derivative citizenship was "in issue" in his immigration proceedings.  See § 1503(a).  "[W]hile a previous judgment may preclude litigation of claims that arose prior to its entry, it cannot be given the effect of extinguishing claims . . . which could not possibly have been sued upon in the previous case."  St. Pierre v. Dyer, 208 F.3d 394, 400 (2d Cir. 2000) (internal quotation marks omitted).

Moreover, even if it were found that the plaintiff could have and should have fully litigated his citizenship claim in Henry I, he might now claim an exception to res judicata because his current claim is based on new evidence that "could not have been discovered with due diligence" during his previous action.  L-Tec Electronics Corp. v. Cougar Electronic Organization, Inc., 198 F.3d 85, 88 (2d Cir. 1999).  However, the same fact that might allow Henry's claim to escape a determination of res judicata – that his parents' legal separation could not have been proven prior to 2005 – also causes it to fail on its merits, as described below.  For this reason, it is unnecessary to decide Henry's case on res judicata grounds.

This opinion also does not reach the government's argument that because Henry is now presenting evidence (the 2008 Consent Order and the legal opinion letter) that was not part of the record in front of USCIS or the AAO, he has not exhausted his claim.

## Plaintiff's Derivative Citizenship Claim

Defendants have also moved for summary judgment on the merits of plaintiff's derivative citizenship claim. Plaintiff has cross-moved for summary judgment. Summary judgment is appropriate when the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In making this determination, a court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir. 2001).

Plaintiff argues that he acquired citizenship through his father's 1972 naturalization, because he was in his father's legal custody at that time and because new evidence illustrates that his parents were legally separated as of 1966. Plaintiff makes this claim to citizenship under section 321 of the INA, 8 U.S.C. § 1432(a):

> (a) A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
> . . .
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents . . .; and if

(4) Such naturalization takes place while such
child is under the age of eighteen years; and
(5) Such child is residing in the United States
pursuant to a lawful admission for permanent residence
at the time of the naturalization of the parent . . . .

8 U.S.C.A. § 1432(a) (1999).  However, leaving aside the

parties' factual dispute over custody, Henry's new evidence

cannot, for purposes of federal immigration and naturalization

law, demonstrate that his parents acquired "a legal separation"

at the time required by § 1432(a).

The Second Circuit has made clear that a "legal separation"

is required under § 1432(a)(3) even if a plaintiff's parents

were never actually married.  In Lewis v. Gonzales, 481 F.3d

125, 130 (2d Cir. 2007), it found that a Jamaican child of unwed

parents had not met the requirements for derivative citizenship

because his parents had never been married and therefore could

not have had a legal separation, as required by § 1432(a)(3).

Plaintiff hopes for a different result here by seizing on a

footnote in Lewis, where the Second Circuit "h[e]ld open the

possibility, however remote, that some jurisdiction might allow

unwed couples to achieve a legal separation."  Id. at 130 n.4.[15]

---

[15] Although "the meaning of the term 'legal separation' within
§ 1432(a)(3) is a question of federal law,"  the Second Circuit
instructs courts interpreting "legal separation" to look to
whether a "legal separation" occurred "under the laws of the
state or nation having jurisdiction of the marriage."  Brissett
v. Ashcroft, 363 F.3d 130, 133-34 (2d Cir. 2004).

Henry argues that following a change in Jamaican law in 2005, legal separation of unwed persons is now possible in Jamaica. See Pl.'s Mem. of Law in Opp'n and in Supp. of Cross-Mot. for Summ. J. at 15-16 ("Pl.'s Mem.")("[T]he only claim that is being litigated in the instant action [is] based on change in Jamaican law . . . and the new evidence that arose out of that change in law, which never existed before such change . . . ."). He presents as evidence of his parents' legal separation a Consent Order, dated July 29, 2008, from the Supreme Court of Jamaica Civil Division. Pl. Ex. K. The Consent Order states that Henry's parents were common law spouses for the period 1953-1966 and "are separated and having been so separated from and since 1966." Id.

Ordinarily, the next question would be whether the Consent Order constitutes a valid formal act of separation under Jamaican law. See Brissett, 363 F.3d at 134. However, for present purposes it is unnecessary to make this determination, because Henry's non-eligibility for citizenship can be determined solely on the basis of United States federal law. See Fierro v. Reno, 217 F.3d 1, 6 (1st Cir. 2000)(holding, in a similar situation, that the court would not determine the validity of a retroactive state custody decree under state law, because the case could be decided on the "strictly federal ground" that Congress did not intend to give effect to the type

of retroactive state custody decree at issue for federal law purposes). Therefore, it will be assumed, arguendo, that the Consent Order is valid under Jamaican law nunc pro tunc as of 1966.[16] Even so, this Consent Order cannot qualify Henry for derivative citizenship, because for purposes of United States federal law, the Consent Order will not be given nunc pro tunc effect.

Although the Second Circuit has not faced this issue, the First and Fifth Circuits have considered whether to give effect to similar nunc pro tunc non-federal court decrees when determining an alien's eligibility for derivative citizenship under 8 U.S.C. § 1432(a). See Fierro, 217 F.3d at 6 (discussed in detail infra); Bustamante-Barrera v. Gonzales, 447 F.3d 388 (5th Cir. 2006) (same). Both circuits determined that, even assuming such a nunc pro tunc order is retroactively valid in its issuing jurisdiction, it cannot serve to establish derivative citizenship retroactively under United States federal law.[17]

---

[16] "Nunc pro tunc, Latin for 'now for then,' refers to a court's inherent power to enter an order having retroactive effect. When a matter is adjudicated nunc pro tunc, it is as if it were done as of the time that it should have been done." Iouri v. Ashcroft, 464 F.3d 172, 181 -182 (2d Cir. 2006) (internal quotation marks and citation omitted).

[17] However, as the Fifth Circuit noted, such a nunc pro tunc order might be able to "enhance an alien's claim of derivative citizenship under § 1432(a)," if such an order legitimately demonstrated that the eligibility criteria of § 1432(a)(3) were

The critical reason that Henry's foreign <u>nunc pro tunc</u>
order cannot establish derivative citizenship is because the
language of § 1432(a) imposes clear temporal requirements for
derivative citizenship eligibility.  Specifically,
§ 1432(a)(3)'s three requirements – naturalization of the
custodial parent, legal custody, and a legal separation — all
are modified by the clause contained in § 1432(a)(4): "Such
naturalization takes place while such child is under the age of
eighteen years."  "A natural reading of these terms, taken
together, therefore requires <u>all</u> of the conditions in Section
321(a)(3) [8 U.S.C. § 1432(a)(3)] — including 'a legal
separation of the parents' — to occur before the child turns
eighteen."  <u>Langhorne v. Ashcroft</u>, 377 F.3d 175, 179 (2d Cir.
2004).

In the case where the occurrence of one of these three
conditions depends on a <u>nunc pro tunc</u> order, a complicated
question arises: should a federal court, for § 1432(a) purposes,
look to the state of events as it <u>actually</u> existed prior to an

in fact met prior to the alien child's eighteenth birthday.
<u>Bustamante-Barrera</u>, 447 F.3d at 401.  Thus, perhaps if a <u>nunc</u>
<u>pro tunc</u> order from a state or foreign court were issued merely
to correct a misstatement or misapplication of law in a prior
order, it might help to establish a valid derivative citizenship
claim.  However, as explained further <u>infra</u>, because Henry's
<u>nunc pro tunc</u> order rests on a 2005 change in Jamaican law, it
does not enhance his claim that his parents were legally
separated prior to his eighteenth birthday in 1977.  Quite the
contrary: according to Henry's own argument, his parents could
not have obtained a legal separation prior to 2005.

alien's eighteenth birthday, or to the state of events that the
nunc pro tunc order retroactively decrees to have existed at
that time?  Both the First and Fifth Circuits agreed that
§ 1432(a) requires an examination of the facts as they actually
existed during the alien's childhood, not the facts as revised
by a later (even valid) non-federal nunc pro tunc order.  See
Fierro; 217 F.3d at 6, Bustamante-Barrera, 447 F.3d at 388.

In Fierro, the plaintiff claimed to have established
eligibility for derivative citizenship based on a 1998 order by
a Massachusetts court that gave his naturalized father legal
custody "nunc pro tunc to September 1, 1977."  217 F.3d at 4.
The First Circuit – even assuming "that for purposes of
Massachusetts law . . . the probate court's modification decree
could properly reclassify Fierro's status nunc pro tunc as of
September 1977" – declined to give effect to such an "ex
post modification of a custody decree" for purposes of
§ 1432(a), and, therefore, found Fierro ineligible for
derivative citizenship.  Id. at 6.

The Fifth Circuit confronted a similar situation in
Bustamante-Barrera, 447 F.3d at 388.  "In 2002 - after the
initiation of Petitioner's removal proceedings at a time when he
was 23 years old - his mother sought to . . . [have] his legal
custody status changed retroactively. At her request . . . a
California court issued a nunc pro tunc amended divorce decree

-31-

('amended decree') which purported to award Petitioner's mother sole legal custody retroactively effective to February 4, 1991." Id. at 391. Again accepting the nunc pro tunc validity of the amended decree under California law, the court "refuse[d] to reward such blatant manipulation of federal law." Id. at 401.

As Fierro explained, both the language of § 1432(a) and its apparent underlying rationale suggest that Congress was concerned with protecting potential United States citizens during their childhood. 217 F.3d at 6. As such, the statute was designed to ensure that when two parents were legally separated and one had custody, their child would "be protected against separation from the parent having legal custody during the child's minority" by allowing automatic naturalization of the child upon the naturalization of such parent. Id. Conversely, the statute specifically does not confer derivative citizenship on the basis of the naturalization of one partner in a non-legally separated couple, because this might have "unforeseen and undesirable implications for many families," Brissett, 363 F.3d at 134, and because "Congress wanted to ensure that only those alien children whose 'real interests' were located in America . . . should be automatically naturalized." Nehme v. INS, 252 F.3d 415, 425 (5th Cir. 2001).[18]

_____

[18] "After all, only when there has been a 'formal ... alteration of the marital relationship' could the federal courts be

Therefore, because the concern of § 1432(a) is protecting the interests of potential citizen children, the relevant facts are those that existed during childhood, <u>not</u> the facts as they exist when an adult alien seeks to prove his earlier eligibility. It is for this reason that a court must determine eligibility by "viewing matters <u>at the time</u> that [an applicant's parent] became naturalized." <u>Fierro</u>, 217 F.3d at 6. As <u>Fierro</u> made clear, this conclusion does not mean that a foreign or state <u>nunc pro tunc</u> order can never help establish derivative citizenship eligibility. <u>Fierro</u>, 217 F.3d at 7 ("There are too many possible variations to say in the abstract, as the government urges, that a later state court decree must always be disregarded in applying section 1432."). However, such an order helps establish eligibility only when it serves to prove that § 1432(a)'s requirements were in fact met during an applicant's childhood, not when it attempts to establish eligibility retroactively by merely creating a legal fiction. <u>See</u> <u>Minasyan v. Gonzales</u>, 401 F.3d 1069, 1080 (9th Cir. 2005); <u>Bustamante-Barrera</u>, 447 F.3d at 401.[19] In Henry's case, as in <u>Fierro</u> and

---

confident that the non-custodial, non-naturalized parent truly has no rights over the child." <u>Bustamante-Barrera</u>, 447 F.3d at 398.

[19] As a case in point, the Ninth Circuit in <u>Minasyan</u> considered a situation in which it found that a <u>nunc pro tunc</u> order enhanced a petitioner's claim to derivative citizenship. 401 F.3d at 1080. The <u>Minasyan</u> Court agreed that the First Circuit was correct not to recognize the <u>nunc pro tunc</u> order at issue in

Bustamante-Barrera, the Consent Order does not enhance his claim

to derivative citizenship because it seeks to retroactively

create a legal fiction that did not in fact exist during his

childhood.

Henry can qualify for derivative citizenship only if some

Jamaican court would have in fact identified his parents as

legally separated at the time of Henry's father's

naturalization, in 1972, or prior to Henry's eighteenth

birthday, in 1977.[20]  See Fierro, 217 F.3d at 6 (asking whether

---

Fierro, because "[r]etroactively changing the legal relationship
would create a legal fiction and would not serve the purpose of
the statute."  Id. at 1080 n.20.  However, it distinguished the
facts in Minasyan from those in Fierro, explaining that the nunc
pro tunc order in Minasyan merely served to reiterate an earlier
divorce decree that "acknowledged a separation that was actually
in effect both in practice and as a matter of California law at
the time Minasyan's mother was naturalized and while Minasyan
was under age eighteen."  Id.; see also Foncette v. Bureau of
Immigration Customs and Enforcement, 05-CV-2453, 2007 WL 140993,
at *6 (M.D.Pa. Jan. 17, 2007) (recognizing a nunc pro tunc order
from the Republic of Trinidad and Tobago that declared, in 2002,
that a legal separation had occurred as of 1962, after finding
that the original record of the separation had been destroyed in
a severe storm but that the separation had in fact occurred in
1962).
[20] While the most natural reading of the statute suggests that the
legal separation must have occurred before the custodial
parent's naturalization, Fierro granted the possibility that an
alien might still qualify for derivative citizenship if he met
§ 1432(a)(3)'s requirements after his custodial parent's
naturalization but before his eighteenth birthday.  See 217 F.3d
at 6.  But see Jordon v. Attorney General of U.S., 424 F.3d 320,
330 (3d Cir. 2005) ("[A] child seeking to establish derivative
citizenship under § 1432(a) must prove . . . that his parent was
naturalized after a legal separation from his other
parent . . .") (internal marks omitted and emphasis added).  In
any event, this minor distinction has no bearing on the outcome

-34-

"any Massachusetts court asked in 1978 [the time of Fierro's father's naturalization]" would have identified his naturalized father as having legal custody and determining none would). It is clear that at that time, § 1432(a)'s requirement that "there has been a legal separation" was not met. See § 1432(a)(3). The Consent Order that Henry relies upon to prove his parents' legal separation was issued in 2008, and as plaintiff candidly acknowledges, such a legal separation was impossible prior to 2005 when the law in Jamaica changed. See Pl.'s Mem. at 15-16 ("[T]he only claim that is being litigated in the instant action [is] based on change in Jamaican law . . . and the new evidence that arose out of that change in law, which never existed before such change . . . ."). The Consent Order therefore only reinforces Henry's ineligibility for citizenship: if it is a 2005 change in the law that allows his parents a legal separation, it follows that any Jamaican court asked between 1972 and 1977 whether Henry's parents had a legal separation would have replied in the negative.

There are also important policy reasons for refusing to allow the nunc pro tunc order at issue here retroactively to establish derivative citizenship eligibility under United States federal immigration and naturalization law. As the First

_____

of Henry's case, as his parents were neither divorced before his father's naturalization nor before his eighteenth birthday.

Circuit explained, "recognizing [such a] nunc pro tunc order
. . . would in substance allow the state court [or a foreign
court] to create loopholes in the immigration laws on grounds of
perceived equity or fairness." Fierro, 217 F.3d at 6.  The
Fifth Circuit later "agree[d] with the First Circuit that
relying on such a nunc pro tunc order to recognize derivative
citizenship would create the potential for significant abuse and
manipulation of federal immigration and naturalization law."
Bustamante-Barrera, 447 F.3d at 401.  Similarly here, to accept
the 2008 Consent Order as evidence of a 1966 legal separation
would allow a retroactive decree from a Jamaican court to create
a loophole in United States immigration law, contravening both
the language and the purpose of our derivative citizenship law.

    Therefore, this Court declines to give the 2008 Jamaican
Consent Order nunc pro tunc effect for United States immigration
and naturalization law purposes. It follows that, as a matter of
law, Henry cannot show that his parents obtained a legal
separation before his eighteenth birthday, as required by
8 U.S.C. § 1432(a).  Thus, Henry cannot establish eligibility
for derivative citizenship.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.


Dated: Brooklyn, New York
       February 2, 2010

                         SO ORDERED:

                         _____/s/_____
                         David G. Trager
                         United States District Judge